## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**MICHELLE MITCHAM,**

**Plaintiff,**

**v.**

**UNIVERSITY OF SOUTH FLORIDA
BOARD OF TRUSTEES,**

                              **Case No.: 8:13-cv-01645-EAK-TGW**

**Defendant.**

_____/

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
### AND SUPPORTING MEMORANDUM OF LAW

COMES NOW Defendant, the University of South Florida Board of Trustees (hereinafter referred to as "Defendant" or "USF"), by and through its undersigned attorneys, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and files its Motion for Summary Judgment and Supporting Memorandum of Law as follows:

### I. Motion

Plaintiff, Michelle Mitcham (hereinafter "Plaintiff"), alleges that USF formerly employed her as an Assistant Professor. (See Plaintiff's Amended Complaint at ¶ 8 (Dkt. 5)). Plaintiff's Amended Complaint against USF contains three (3)[1] counts: Count I alleges that USF discriminated against her on the basis of her race in violation of Title VII of the Civil Rights Act of 1964 (hereinafter "Title VII"), 42 U.S.C. Section 2000e-5; Count II alleges that USF discriminated against her on the basis of her gender in violation of Title VII; and, Count III,

---

[1] On August 27, 2013, this Court entered an Order dismissing Counts IV and V with prejudice, and dismissing Plaintiff's claims under the Florida Civil Rights Act. Consequently, only Plaintiff's claims against Defendant arising under Title VII, as contained in Counts I through III of the Amended Complaint, remain.

alleges that USF retaliated against her in violation of Title VII.  (See generally Plaintiff's Amended Complaint (Dkt. 5)).  Plaintiff's claims against USF center upon USF's decision to deny Plaintiff tenure and promotion from Assistant Professor to Associate Professor.  (Id. at ¶ 1 (Dkt. 5)).  As set forth below, there is no genuine issue as to any material fact, and USF is entitled to summary judgment as a matter of law on all of Plaintiff's remaining claims against it in this cause.

## II.  Statement of Undisputed Material Facts

### A.    Plaintiff

Plaintiff is an African American female.  (Plaintiff's Amended Complaint at ¶ 4 (Dkt. 5)).  At all times relevant to this action, Plaintiff was employed by USF as an Assistant Professor in the Psychological and Social Foundations Department, which is in USF's College of Education.  (Id. at ¶ 8; Plaintiff's Depo. p. 171, l. 4-6).  Plaintiff was employed by USF as an Assistant Professor from the Fall 2005 semester until September 2011.  (Plaintiff's Depo. p. 145, l. 18 – p. 146, l. 1).

### B.    USF

USF is a state university.  Section 1000.21(6)(d), Fla. Stat.  The Board of Trustees of USF is the legal entity with the power to sue and be sued in the name of USF.  Section 1001.72, Fla. Stat.  At all times relevant hereto, the President of USF was Dr. Judy Genshaft, the Provost of USF was Dr. Ralph Wilcox, the Dean of the College of Education was Dr. Colleen Kennedy, and the Chair of the Department of Psychological and Social Foundations was Dr. Herb Exum.  (Wilcox Aff. ¶¶ 2, 4, 5, 6; Exum Aff. ¶ 2; Kennedy Aff. ¶¶ 2, 4-5).

C.     **USF's Tenure Process**

The tenure and promotion process at USF is a rigorous six-year undertaking.   The position of Assistant Professor is generally the first position held by a newly graduated Ph.D. These positions are of finite length and are "tenure earning," which means that each individual Assistant Professor has a limited period of time in which to demonstrate his or her skills in each of three basic areas: (a) teaching; (b) research; and, (c) service.  (Wilcox Aff. ¶ 7).  At the end of that period of time, the Assistant Professor completes a lengthy application for tenure and submits it for evaluation and review.  (Plaintiff's Depo. p. 267, l. 24 – p. 268, l. 5; Wilcox Aff. ¶¶ 8-9).  This evaluation and review process will determine whether or not the individual is granted or denied tenure.

A grant of tenure entails a promotion from Assistant Professor to Associate Professor, and a lifetime contract during which the Professor can only be removed by voluntary resignation or for very narrowly defined conditions.  A denial of tenure typically results in the Assistant Professor being retained for only one additional year.  (Wilcox Aff. ¶ 8).

Between three and six "external evaluators" review each of the applicant's tenure packages and supply a short narrative with their conclusions and recommendations, which are placed in the applicant's tenure application package for review.  (Wilcox Aff. ¶ 10).  The application packages for each candidate for tenure are then thoroughly and independently evaluated by the following: (1) faculty members within the applicant's department (in Plaintiff's case, the Department of Psychological and Social Foundations); (2) the Department Chair (in Plaintiff's case, Dr. Herb Exum); (3) faculty members within the College (in Plaintiff's case, the College of Education); (4) the Dean of the College (in Plaintiff's case, Dr. Colleen Kennedy); (5) the Provost (Dr. Ralph Wilcox); and, (6) the President of USF (Dr. Judith Genshaft).  (Wilcox

3

Aff. ¶ 11).   If the President does not take action on the Provost's recommendation within a certain time period, this constitutes a de-facto endorsement of the Provost's recommendation, and such recommendation becomes binding.  (Wilcox Aff. ¶ 11).  Notably, only the final level of review is binding (either Provost or President); each preceding stage of review only results in a recommendation.  (Plaintiff's Depo. p. 237, 25 – p. 238, l. 10; p. 303, l. 4-24; Wilcox Aff. ¶ 11).

USF makes a tremendous investment of time and financial resources into the hiring and training of tenure track Professors.  (Wilcox Aff. ¶ 13).  Therefore, USF's expectation and goal is that all tenure track Professors will achieve tenure.  From the point of hire forward, a tenure track Professors is not in competition with any other tenure applicants regarding whether or not he/she obtains tenure. (Wilcox Aff. ¶ 12).   There are no defined or "set" number of tenured faculty positions.   No two candidates are ever compared on a "head to head" basis, and no two candidates are ever in competition for a single "tenured" position.  (Wilcox Aff. ¶ 12).

D.    **Tenure Decision Concerning Plaintiff**

1.    _Plaintiff's Poor External Reviews_.  On September 7, 2010, Plaintiff submitted her application for tenure and promotion.  (Plaintiff's Depo. Exhibit 8, Bates No. USF 000092; Dorn Aff. ¶3; Tan Aff. ¶ 3; Kennedy Aff. ¶ 6; Wilcox Aff. ¶ 15).   Pursuant to USF's application procedure, Plaintiff selected four (4) external reviewers to review and evaluate her application for tenure.  Written evaluations from those individuals were then included in her application. (Plaintiff's Depo. p. 271, l. 23 – p. 275, l. 6; Plaintiff's Depo. Exhibit 8, Bates Nos. USF 000185-000198).

Plaintiff admits that one of the external reviewers she selected, Dr. Courtland Lee from the University of Maryland, rated her as "marginal."   (Plaintiff's Depo. p. 276, l. 10-21). Plaintiff further admits that Dr. Lee's evaluation hurt her application for tenure and promotion.

4

(Plaintiff's Depo. p. 286, l. 22 – p. 287, l. 1).  Dr. Lee's written evaluation states, in pertinent

part, as follows:

> Dr. Mitcham presents a somewhat confusing record of research and scholarship.
> While I count 12 publications, only 6 of these appear to be in identifiable
> professional journals.  Only one of these appears in a top-tier journal in her field
> of counseling and it is an invited response (I extended the invitation).  Aside from
> the journal articles, the other scholarly exhibits appear to be newspaper/letter
> articles.  I feel it is misleading to consider these to be sholarly products in the
> same category as journal articles.
>
> * * * * *
>
> My review of Dr. Mitcham's dossier leads me to consider her as falling
> somewhere in the middle of the pack of individuals or her scholarly generation.
>
> * * * * *
>
> After 2 years as chair of the university promotion and tenure committee here at
> the University of Maryland, it is my assessment that Dr. Mitcham has, at best, a
> marginal case for promotion and tenure.

(Plaintiff's Depo. Exhibit 8, Bates Nos. USF 000197-000198).   Similarly, a second external

reviewer, Dr. Cheryl Holcomb-McCoy of Johns Hopkins University, gave Plaintiff what was at

best a lukewarm review when she described Plaintiff's scholarship as "adequate" and rendered

the opinion that Plaintiff had made only "moderate growth" in her research and scholarship.  (Id.

at USF 000195-000196).

    *2.    Plaintiff's Poor Student Evaluations.*   Plaintiff's application for tenure and

promotion included a section for student evaluations.  (Plaintiff's Depo. Exhibit 8, Bates Nos.

USF 000116-000127).   That section revealed that, between the Fall 2005 and Summer 2010

semesters, Plaintiff consistently received much lower numerical ratings from students than the

average ratings for faculty within the College of Education as a whole and faculty with the

Department of Psychological and Social Foundations.  (Plaintiff's Depo. Exhibit 8, Bates Nos.

USF 000123-000127).   To illustrate, Plaintiff received student evaluation scores of 2.40 during

the Spring 2006 semester, whereas the average scores for faculty within Plaintiff's department and for faculty within the College of Education were 4.18 and 4.44, respectively. (Plaintiff's Depo. Exhibit 8, Bates No. USF 000123).

　　　3.　　*Multi-Level Review of Plaintiff's Application*. On October 21, 2010, following an independent review of Plaintiff's application for tenure and promotion, the Department Faculty Committee for the Department of Psychological and Social Foundations voted to recommend that Plaintiff be denied tenure and promotion. (Plaintiff's Depo. Exhibit 8, Bates Nos. USF 000201-000206, 000254-000255, 000261; Tan Aff. ¶ 6). The Committee's "Summary & Recommendation" report noted concerns about Plaintiff's student evaluations, research, and external reviews. (Id. at USF 000201-000206; Tan Aff. ¶ 7).

　　　On October 24, 2010, after independently reviewing Plaintiff's application for tenure and promotion, the Department Chair, Dr. Exum, recommended that Plaintiff be denied tenure and promotion. (Plaintiff's Depo. Exhibit 8, Bates Nos. USF 000213-000216, 000258, 000263; Exum Aff. ¶¶ 6-9).

　　　On November 9, 2010, following an independent review of Plaintiff's application for tenure and promotion, the College Faculty Committee for the College of Education voted unanimously to recommend that Plaintiff be denied tenure and promotion. (Plaintiff's Depo. Exhibit 8, Bates Nos. USF 000217-000220, 000256, 000261; Dorn Aff. ¶¶ 6-8). The Committee's "Summary & Recommendation" report noted concerns about Plaintiff's student evaluations and research. (Id. at USF 000217-000206; Dorn Aff. ¶ 9).

　　　On December 10, 2010, after conducting an independent review of Plaintiff's application for tenure and promotion, the Dean of the College of Education, Dr. Colleen Kennedy, recommended that she be denied tenure and promotion. (Plaintiff's Depo. Exhibit 8, Bates Nos.

USF 000221-000224, 000258, 000263; Kennedy Aff. ¶¶ 9-12).  The Dean's "Summary & Recommendation" report noted concerns about Plaintiff's student evaluations, research, and external reviews.  (Id. at USF 000221-000224; Kennedy Aff. ¶13).

On January 18, 2011, Dr. Ralph C. Wilcox, Provost and Executive Vice President of USF, concluded that Plaintiff should be denied tenure and promotion.  (Plaintiff's Depo. Exhibit 8, Bates Nos. USF 000259 and 000264; Wilcox Aff. ¶ 19).  By letter dated April 15, 2011, Dr. Wilcox informed Plaintiff that her application for tenure had been denied because her "record [did] not support a confident projection of sustained performance in teaching, research, and service in [her] discipline. . . ."  (Plaintiff's Depo., Exhibit 10; Wilcox Aff. ¶ 9).  Moreover, he informed Plaintiff that her employment with USF would end upon conclusion of the 2011-12 academic year.  (Id.).

  4. _No Evidence of Discrimination or Retaliation Concerning the Tenure Decision_.
Plaintiff cannot substantiate her claims that she was denied tenure and promotion due to her race, gender, and/or in retaliation for protected activity.  Indeed, Plaintiff admitted in her deposition that she does not even believe that President Genshaft, Provost Wilcox, Dean Kennedy, or Dr. Exum discriminated against her on the basis of her race.  (Plaintiff's Depo. p. 169, l. 9 - p. 170, l. 23).  Plaintiff also admitted that she does not believe that President Genshaft, Dean Kennedy, or Provost Wilcox discriminated against her because of her gender.  (Plaintiff's Depo. p. 233, l. 8-24).  Finally, Plaintiff admitted that she has no evidence that President Genshaft, Dean Kennedy or Provost Wilcox retaliated against her or, for that matter, does not even know whether they were aware of any internal complaints of discrimination that she made at USF or her EEOC Charge of Discrimination.  (Plaintiff's Depo. p. 252, l. 24 - 254, l. 25).  Notably, Plaintiff admitted in deposition that USF's President and Provost can make an independent decision

concerning promotion and tenure that stands, regardless of the votes of others.  (Plaintiff's Depo. p. 303, l. 4-14).

Not only is Plaintiff completely unable to substantiate her claims of discrimination with respect to her tenure and promotion, she admitted facts in her deposition that prove beyond question that her race and gender played no role in that decision.  More specifically, Plaintiff admitted that Dr. Wilma Henry was also an African-American female professor in the same Department as Plaintiff, admitted that Dr. Henry was being considered for tenure and promotion the same year as Plaintiff, and admitted that Dr. Henry received tenure and promotion that year. (Plaintiff's Depo. p. 175, l. 23 – p. 176, l. 6; p. 210, l. 6-9; see also Dorn Aff. ¶¶ 3-5; Tan Aff. ¶¶ 3-5; Exum Aff. ¶¶ 3-5; Kennedy Aff. ¶¶ 6-8; Exum Aff. ¶ 20).

### E.    Hostile Work Environment Claims

Plaintiff contends that Virginia "Sandy" Turner, Dr. Debra Osborn, and Dr. Sue Street subjected her to a hostile work environment because of her race.  (See Plaintiff's Answer to Interrogatory No. 10).  Plaintiff also contends that Dr. Carlos Zalaquett discriminated against her on the basis of her gender.  (See Plaintiff's Answer to Interrogatory No. 12).  Finally, Plaintiff contends that Ms. Turner, Dr. Exum, Dr. Zalaquett, Dr. Osborn, and Dr. Harold Keller retaliated against her for engaging in protected activity under Title VII.  (See Plaintiff's Answer to Interrogatory No. 12).

Plaintiff complains that Dr. Sue Street, who was another professor in the department, discriminated against her based upon her race by calling her "Peanut Butter."  (Plaintiff's Depo. p. 223, l. 13 – 224, l. 2).  According to Plaintiff, however, Dr. Street stopped calling her "Peanut Butter" during the Spring of 2006 -- five (5) years before Plaintiff submitted her Charge of

Discrimination to the EEOC.  (Plaintiff's Depo. p. 231, l. 23 – p. 232, l. 7; Plaintiff's Depo. Exhibit 7).

Plaintiff contends that Dr. Osborne's acts of racial discrimination against her consisted of rudeness in the form of not speaking with to her "sometimes," shunning, and "condescending" emails.  (Plaintiff's Depo. p. 178, l. 15 – p. 179, l. 1).  Plaintiff contends that Dr. Osborne, who was a program coordinator within the department in which Plaintiff taught, sent her approximately three (3) rude and condescending emails.  (Plaintiff's Depo. p. 199, l. 12-25; p. 201, l. 1-25).  Dr. Osborne did not call Plaintiff any names in the emails.  (Plaintiff's Depo. p. 200, l. 1-7).  Instead, the emails, which all related to Plaintiff's performance of her teaching assignments, were purportedly "rude" because they contained comments that Dr. Osborne was "shocked" that Plaintiff was not in class when it began and that Plaintiff should not be in the back of a class reading a magazine.  (Plaintiff's Depo. p. 200, l. 15-23; p. 202, l. 21 – p. 203, l. 25).  Although Plaintiff claims that Dr. Osborne also made several rude statements to her, she does not recall the specifics of those statements.  (Plaintiff's Depo. p. 204, l. 6-23).  Plaintiff contends that the purportedly rude emails and comments took place over a period of two (2) or three (3) years.  (Plaintiff's Depo. p. 199, l. 12-25).  Moreover, at least some of those rude comments and emails took place prior to 2006.  (Plaintiff's Depo. p. 215, l. 5-7).  Therefore, the purportedly rude comments and emails would have ceased, at the latest, during 2009.

Plaintiff also contends that Dr. Osborne gave her undesirable teaching assignments because of her race.  Plaintiff complains that Dr. Osborne assigned her to teach a course at night, but assigned a Caucasian professor, Dr. Baggerly, to teach that same class during the day (Plaintiff's Depo. p. 179, l. 7 – p. 180, l. 16).  However, Plaintiff could not identify any facts indicating that the assignment was based upon her race.  Instead, she merely "assumed" that the

assignment was due to her race.  (Plaintiff's Depo. p. 196, l. 1-25).  Plaintiff admitted in her deposition that Dr. Osborne told her that she assigned Dr. Baggerly to teach the course during the day because she had a child and had higher teaching evaluations, both of which Plaintiff admitted were true.  (Plaintiff's Depo. p. 190, l. 10 – p. 191, l. 19; p. 193, l. 9-12).  Plaintiff complains that Dr. Osborne also assigned her to teach a course on diversity.  (Plaintiff's Depo. p. 181, l. 8 – p. 182, l. 12).  However, Plaintiff does not know whether Dr. Osborne assigned her to teach that course in order to hurt her chances of becoming tenured.  (Plaintiff's Depo. p. 197, l. 13-18).  Although Plaintiff believes that Dr. Osborne gave her that course assignment because of her race, she could not identify any facts during her deposition to support that belief.  (Plaintiff's Depo. p. 196, l. 21 – p. 197, l. 12).  The diversity class -- "Multi-Cultural Counseling" -- resulted in the highest student evaluations that she received in any class that she taught during the 2005-2006 academic year.  (Plaintiff's Depo. p. 279, l. 23 – p. 282, l. 14).  With the exception of only one (1) class, Plaintiff received higher student evaluations in the diversity class than she did in any other class that she taught during her tenure with USF.  (Plaintiff's Depo. p. 284, l. 10-18; Plaintiff's Depo. Exhibit 8, Bates Nos. USF 000123-000127).

Plaintiff contends that Ms. Turner, who was a secretary in the department, discriminated against her because of her race by making disrespectful comments or raising her voice at her and by violating protocol by soliciting evaluations from students about Plaintiff.  (Plaintiff's Depo. p. 211, l. 7 – p. 212, l. 10).  However, Plaintiff can offer no facts to support her claim that Ms. Turner's actions were motivated by racial animus.  To the contrary, Plaintiff admitted that Ms. Turner and Dr. Exum -- who is African-American -- were friends.  (Plaintiff's Depo. p. 221, l. 18-22).  Moreover,  Plaintiff testified in deposition that Ms. Turner's negative and "toxic" attitude not only affected her, but "affected everybody."  (Plaintiff's Depo. p. 59, l. 16-25).

Plaintiff complains that Dr. Zalaquett, another professor in the department, discriminated against her because of her gender by yelling at her and being condescending.  (Plaintiff's Depo. p. 238, l. 11-18).   However, Plaintiff could not explain how his actions were related to or motivated by her gender.  Indeed, Plaintiff testified that "everybody in the College of Education was afraid of him" -- not just women -- and that everyone avoided Dr. Zalaquett.  (Plaintiff's Depo. p. 249, l. 15 – p. 250, l. 3; p. 256, l. 19-25).  Moreover, Plaintiff testified that she thought Dr. Zalaquett's actions may have been "cultural."  (Plaintiff's Depo. p. 238, l. 11 – p. 239, l. 9).  Even assuming, *arguendo*, that Dr. Zalaquett raised his voice at Plaintiff, it appears that such action was the result of anger that Dr. Zalaquett felt toward Plaintiff for exceeding her authority with respect to an internship program between USF and the Hillsborough County School District.  (Plaintiff's Depo. p. 240, l. 1 – p. 243, l. 25).

Plaintiff complains that Dr. Exum stopped inviting her to faculty meetings, and that Ms. Turner, Dr. Zalaquett, Dr. Osborn, and Dr. Exum stopped speaking to her in retaliation for engaging in protected activity.   (See Plaintiff's Answer to Interrogatory Nos. 12 and 14).  However, Plaintiff cannot provide any facts to support her claim that such actions, even if true, were motivated by retaliatory animus.

**F.**     **Plaintiff's Untimely Complaint**

On April 8, 2011, Plaintiff submitted a Charge of Discrimination to the United States Equal Employment Opportunity Commission (hereinafter "EEOC").  (Plaintiff's Depo. p. 304, l. 19 – p. 309, l. 1; Plaintiff's Depo, Exhibit 12).  Plaintiff listed her mailing address on the Charge of Discrimination as follows:  P.O. Box 46326, Tampa, Florida  33646.  (Plaintiff's Depo. Exhibit 12; Plaintiff's Depo. p. 308, l. 24 – p. 309, l. 1; p. 310, l. 18 – p. 312, l. 25).  Although Plaintiff was using that post office box when she submitted her Charge of Discrimination, she

stopped using it before the EEOC issued its Notice of Right to Sue.  (Plaintiff's Depo. p. 307, l. 2 – p. 308, l. 3).  However, Plaintiff did not inform the EEOC of her new mailing address.

On January 16, 2013, the EEOC issued a Notice of Right to Sue to Plaintiff.  (First Amended Complaint, ¶ 7; Plaintiff's Depo. Exhibit 13).  The Notice of Right to Sue was sent to Plaintiff at the post office box that Plaintiff listed on her Charge of Discrimination.  (Plaintiff's Depo. p. 310, l. 23 – p. 311, l. 3; Compare First Amended Complaint, Exhibit 1, and Plaintiff's Depo. Exhibits 12 and 13).  At that time, Plaintiff was no longer utilizing that post office box. (Plaintiff's Depo. p. 312, l. 8-15).  Consequently, she did not receive the Notice of Right to Sue.

During the end of May 2013 or beginning of June 2013, Plaintiff contacted the EEOC to inquire about the status of its investigation into her Charge of Discrimination.  (Plaintiff's Depo. p. 326, l. 18 – p. 327, l. 7).  At that time, Plaintiff informed the EEOC for the first time of her new mailing address.  (Id. p. 326, l. 3-10).  On June 14, 2013, approximately two (2) weeks after Plaintiff informed the EEOC of her new mailing address, she received the Notice of Right to Sue.  (Id. p. 325, l. 11 – p. 326, l. 17; First Amended Complaint, ¶ 7).  On June 24, 2013,  more than five (5) months after the EEOC first issued the Notice of Right to Sue, Plaintiff initiated this action when she filed her initial Complaint.  (Dkt. 1).

### III.  Argument and Authority

#### A.    The Standard for Summary Judgment

Summary judgment is appropriate if there exists no genuine issue of material fact such that the moving party is entitled to a judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56.

#### B.    Plaintiff's Claims Are Time Barred.

In order to pursue a claim under Title VII, a plaintiff must initiate a civil action and bring that

12

claim within ninety (90) days after the EEOC has given her notice of the right to sue.  42 U.S.C. Section 2000e-5(f)(1).  The ninety (90) day suit-filing period normally commences three (3) days after the post office has attempted to deliver the notice of right to sue to the plaintiff.  Zillyette v. Capital One Financial Corp., 179 F.3d 1337, 1342 (11th Cir. 1999); see also Kerr v. McDonald's Corp., 427 F.3d 947, 953 n. 9 (11th Cir. 2005) ("this court has applied a presumption of three days for receipt by mail, akin to the time period established in Fed.R.Civ.P. 6(e)").  If the plaintiff fails to file suit and bring the Title VII claim within that ninety (90) day suit-filing period, her Title VII claims are barred unless she can demonstrate that the deadline should be equitably tolled.

There is no reason why a plaintiff should enjoy a manipulable open-ended time extension which could render the statutory suit-filing deadline meaningless.  Lewis v. Conners Steel Co., 673 F.2d 1240, 1242-43 (11th Cir. 1982).  Thus, where a plaintiff has failed to meet the suit-filing deadline, the burden is on the plaintiff to show that she is entitled to the extraordinary remedy of equitable tolling. See Ross v. Buckeye Cellulose Corp., 980 F.2d 648, 661 (11th Cir. 1993).

The ninety (90) day suit-filing period is not tolled where the plaintiff has failed to inform the EEOC of her new address, which then delays the plaintiff's receipt of the notice of the right to sue and results in her failure to meet the suit-filing deadline.  According to the Eleventh Circuit:

> Plaintiff should be required to assume some minimum responsibility himself for an orderly and expeditious resolution of his dispute. . . . We believe it to be fair and reasonable for the plaintiff . . . to assume the burden of advising the EEOC of address changes or to take other reasonable steps to ensure delivery of the notice to his current address. . . .If he did not contribute that minimum assistance to the process, he should not be heard to complain that he did not receive the letter delivered to the last address known to the EEOC. . . .Placement of this *de minimis* burden on the plaintiff also comports with the legislative purpose undergirding the ninety-day filing period.

Lewis v. Conners Steel Co., 673 F.2d 1240, 1242-43 (11th Cir. 1982); see also Zillyette, 179 F.3d at 1340 (holding that a plaintiff's Title VII claim is barred if the plaintiff failed to "advis[e] the EEOC of address changes or to take reasonable steps to ensure delivery of the notice to his current address" . . . because "[i]f [the plaintiff] did not contribute that minimum assistance to the process, he should not be heard to complain that he did not receive the letter delivered to the last address known to the EEOC. . . .").[2]

In the case at bar, Plaintiff's Title VII claims are time barred, because she did not initiate this civil action and bring those claims until more than five (5) months after the EEOC issued a Notice of Right to Sue to her.   Moreover, she is not entitled to the extraordinary remedy of equitable tolling, because the delay is attributable solely to her.   Indeed, Plaintiff admitted in her deposition that she submitted a Charge of Discrimination to the EEOC, wherein she listed a post office box as her mailing address.   She further admitted that, while the EEOC was conducting its investigation, she stopped using that post office box.   Yet, by Plaintiff's own admission, she failed to inform the EEOC that she had stopped using that post office box and failed to inform the EEOC of her new mailing address.   Consequently, she did not receive the Notice of Right to Sue until five (5) months after it had initially been mailed.   Thus, plaintiff failed to meet the ninety (90) day suit-filing deadline, is not entitled to equitable tolling, and her Title VII claims are barred in their entirety as untimely filed.

---

[2] The undersigned acknowledge the opinion in Underwood v. City of Ft. Myers, 890 F. Supp. 1018 (M.D. Fla. 1995), but submit that it is readily distinguishable from the case at bar.   In Underwood, the plaintiff's delayed receipt of the EEOC's right to sue notice was through no fault of her own.   Although the notice was mailed to the correct address, it was purportedly never delivered either because the United States Post Office lost the notice or misdelivered it.   In the case at bar, on the other hand, Plaintiff's delayed receipt of the EEOC's right to sue notice is entirely attributable to her -- she failed to inform the EEOC of a change in her mailing address, which in turn resulted in the untimely filing of this action.   See 29 C.F.R. Section 1601.7(b) (requiring aggrieved parties to keep the EEOC informed of their correct mailing address).   Thus, unlike in Underwood, Plaintiff is not entitled to have the ninety (90) day period tolled.

C.      <u>Plaintiff's Failure to Exhaust Administrative Remedies</u>

Even assuming, *arguendo*, that Plaintiff's Title VII claims are not time barred in their entirety -- which they are -- Plaintiff failed to exhaust her administrative remedies with respect to some of the purportedly discriminatory acts about which she now complains.  Plaintiff's claims of discrimination, insofar as they pertain to those acts, are therefore barred.

It is well settled that before commencing a Title VII action in federal court, a plaintiff in a deferral state like Florida must file an administrative charge of discrimination within 300 days of the discriminatory act.  A plaintiff cannot recover for acts of discrimination and retaliation that occur prior to the 300 day period.  <u>Wolf v. MWH Const., Inc.</u>, 2014 WL 3707658 *6 (M.D. Fla. 2014).

First, Plaintiff's claim that Dr. Street discriminated against her based upon her race by calling her "Peanut Butter" is barred.  Plaintiff admitted that Dr. Street stopped calling her "Peanut Butter" during the Spring of 2006 -- five (5) years before Plaintiff submitted her Charge of Discrimination to the EEOC.  (Plaintiff's Depo. p. 231, l. 23 – p. 232, l. 7; Plaintiff's Depo. Exhibit 7).  Thus, that claim is clearly barred.

Second, Plaintiff's claim that Dr. Osborne discriminated against her based upon her race by making rude and condescending emails and comments is barred.  Plaintiff contends that the purportedly rude emails and comments took place over a period of two (2) or three (3) years. (Plaintiff's Depo. p. 199, l. 12-25).  Moreover, at least some of those rude comments and emails took place prior to 2006.  (Plaintiff's Depo. p. 215, l. 5-7).  Therefore, the purportedly rude comments and emails would have ceased, at the latest, during 2009 -- more than one (1) year before Plaintiff submitted her Charge of Discrimination to the EEOC.  Thus, that claim is clearly barred.           .

**D.**     **Plaintiff's Tenure and Promotion Claims Are Meritless.**

*1.*     *General Analytical Framework for Discrimination Claims.*   A plaintiff may prove discrimination by either direct evidence or by circumstantial evidence using the burden-shifting analysis articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  To establish a prima facie case using circumstantial evidence of discrimination, a plaintiff must show: (i) plaintiff belongs to a protected class; (ii) plaintiff was qualified for the position; (iii) plaintiff suffered an adverse employment action; and (iv) a comparable non-protected person was treated more favorably than the plaintiff.  This "similarly situated" person must be "nearly identical to plaintiff in all respects."  Barnett v. Dept. of Veterans Affairs, 153 F.3d 338, 341 (6th Cir. 1998); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); Mitchell v. Toledo Hosp., 964 F.2d 577, 582-83 (6th Cir. 1992).

If a plaintiff is able to establish a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).  The defendant's burden at this point is "exceedingly light."  Meeks v. Computer Assoc. Int'l, 15 F.3d, 1013, 1019 (11th Cir. 1994).

Once that is done, the burden shifts back to the plaintiff to show that the defendant's legitimate non-discriminatory reason is actually a pretext for discrimination.  In order to demonstrate that an employer's reasons for denying tenure is pretextual, a plaintiff must prove that the employer's legitimate non-discriminatory reasons either: (1) have no basis in fact; (2) did not motivate the denial of tenure; or, (3) were insufficient to motivate the tenure denial.  Stein v. Kent State University, 181 F.3d 103, 1999 WL 357752 at * 6 (6th Cir. 1999).  The ultimate

burden of persuasion remains on the plaintiff at all times.  <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981); <u>Barnett</u>, 153 F.3d at 341.

   *2.*   *General Analytical Framework for Retaliation Claims*.  To establish a prima facie case of retaliation, Plaintiff must prove that: (1) she engaged in statutorily-protected activity; (2) she suffered a materially adverse action; and (3) there was a causal nexus between the two events.  <u>Butler v. Alabama Dep't of Transp.</u>, 536 F.3d 1209, 1212–13 (11th Cir. 2008).  Regarding the third element, Plaintiff must prove that "but for" engaging in the protected activity, she would not have suffered the adverse action.  <u>Univ. of Texas S.W. Med. Cntr. v. Nassar</u>, 133 S. Ct. 2517 (2013).

   *3.*   *Analysis In Tenure Cases*.  Tenure decisions in the university setting involve a combination of factors that distinguish them from employment decisions generally. <u>Zahorik v. Cornell Univ.</u>, 729 F.2d 85, 92 (2nd Cir. 1984), *citing* <u>Lieberman v. Gant</u>, 630 F.2d 60, 64 (2nd Cir. 1980).  For that reason,

> [c]ourts must be vigilant not to intrude into [tenure] determination[s], and should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure.  Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professional, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges.

<u>Jiminez v. Mary Washington Coll.</u>, 57 F.3d 369, 377 (4th Cir. 1995), *cert. denied,* <u>516 U.S. 944 (1995)</u>, *quoting* <u>Kunda v. Muhlendberg Coll.</u>, 621 F.2d 532, 548 (3rd Cir. 1980).

   At least six federal circuits have endorsed the "significant body of case law that emphasizes courts are not to sit as 'super-tenure committees' and substitute judgment for that of the university in the absence of a strong showing of discrimination", <u>Stein v. Kent State Univ.</u>,

1999 U.S. LEXIS 9152, *21-*22 (6th Cir. 1999).[3]  "Courts . . . are understandably reluctant to review the merits of a tenure decision." Zahorik, 729 F.2d at 93, *citing* Lieberman v. Gant, 630 F.2d at 66 (2nd Cir. 1980). "Where the tenure file contains the conflicting views of specialized scholars, triers of fact cannot hope to master the academic field sufficiently to review the merits of such views and resolve the differences of scholarly opinion. Moreover, the level of achievement required for tenure will vary between universities and between departments within universities. Determination of the required level in a particular case is not a task for which judicial tribunals seem aptly suited. Finally, statements of peer judgments as to departmental needs, collegial relationships and individual merit may not be disregarded absent evidence that they are a facade for discrimination." Zahorik, 729 F.2d at 93.

Regarding "aggrieved professors," courts "review professorial employment decisions with great trepidation." Jiminez, 57 F.3d 369, 376 (4th Cir. 1995).  In these situations, a court's "review is narrow, being limited to determining whether the appointment or promotion was denied because of a discriminatory reason." Jiminez, 57 F.3d at 377, *quoting* Smith v. Univ. of North Carolina, 632 F.2d 316, 345-47 (4th Cir. 1980).

4.    *Denial of Tenure and Promotion Not Due to Discrimination or Retaliation*.  First, Plaintiff cannot demonstrate that she was denied tenure and promotion due to her race, gender, and/or in retaliation for engaging in any protected activity.  Indeed, the decision was not based upon any discriminatory or retaliatory animus.  (Dorn Aff. ¶ 9; Tan Aff. ¶ 7; Exum Aff. ¶ 10; Kennedy Aff. ¶ 13; Wilcox Aff. ¶ 19).  Indeed, Plaintiff admitted in her deposition that she does

---

[3] See also Villaneuva v. Wellesley Coll., 930 F.2d 124 (1st Cir.); Lieberman v. Gant, 630 F.2d 60 (2nd Cir. 1980); Jiminez, 57 F.3d 369; Smith v. Univ. of North Carolina, 632 F.2d 316 (4th Cir. 1980); Tanik v. Southern Methodist Univ., 116 F.3d 775 (5th Cir.); Travis v. Bd. of Regents, 122 F.3d 259 (5th Cir. 1997); Gutzwiller v. Fenik, 860 F.2d 1317 (6th Cir. 1988); Brousard-Norcross v. Augustana Coll. Assn., 935 F.2d 974 (8th Cir. 1991).

not believe that President Genshaft, Provost Wilcox, or Dean Kennedy discriminated against her on the basis of her race or gender, or that they retaliated against her for engaging in any protected activity.  Moreover, as set forth in Sections II.E. and III.E. herein, the only individuals Plaintiff has identified who purportedly discriminated or retaliated against her, and the purported discriminatory and/or retaliatory actions in which they engaged had nothing whatsoever to do with the tenure and promotion decision concerning Plaintiff.

Not only is Plaintiff unable to present any evidence of discriminatory or retaliatory intent with respect to her tenure and promotion, she admitted facts in her deposition that Dr. Wilma Henry, who was also an African-American female professor in the same Department as Plaintiff, received tenure and promotion the same year that Plaintiff was being considered for tenure and promotion.

Second, Plaintiff cannot survive summary judgment under "cat's paw" theory.  Simply put, she cannot present any evidence to demonstrate that anyone manipulated the denial of her application for tenure and promotion.  To the contrary, it is undisputed that the Department Faculty Committee for the Department of Psychological and Social Foundations, Dr. Exum, College Faculty Committee for the College of Education, Dean Kennedy, and Provost Wilcox each separately conducted an independent review of Plaintiff's application for tenure and promotion and came to their own conclusions independent of the others.  (Dorn Aff. ¶ 8; Tan Aff. ¶; Exum Aff. ¶ 9; Kennedy Aff. ¶ 12; Wilcox Aff. ¶ 18).  There are no facts to suggest that Provost Wilcox was subjected to pressure or undue influence by anyone when he concluded -- following his independent review of Plaintiff's application -- that Plaintiff should be denied tenure and promotion.

5.    *Legitimate Non-Discriminatory and Non-Retaliatory Reasons For Decision*.   By letter to Plaintiff dated April 15, 2011, Provost Wilcox set forth legitimate, non-discriminatory and non-retaliatory reasons for the decision to deny Plaintiff tenure and promotion.   As Dr. Wilcox explained in his letter to Plaintiff, her application for tenure and promotion because her "record [did] not support a confident projection of sustained performance in teaching, research, and service in [her] discipline. . . ."

6.    *No Proof of Pretext*.   While Plaintiff will undoubtedly quarrel with the assessment that her "record [did] not support a confident projection of sustained performance in teaching, research, and service in [her] discipline," she cannot present any facts to demonstrate that those reasons were merely a pretext to mask unlawful discrimination and/or retaliation.   See Brown v. Northside Hosp., 2009 WL 282058 *4 (11th Cir. 2009) ("To show pretext, a plaintiff cannot merely quarrel with the wisdom of the employer's reason, but must meet that reason head on and rebut it.").

The explanation that Plaintiff's "record [did] not support a confident projection of sustained performance in teaching, research, and service in [her] discipline" is supported by the reports of two (2) external reviewers whom Plaintiff selected to review and comment upon her application.   As previously set forth herein, those reviews described Plaintiff as having "at best, a marginal case for promotion and tenure," as being "in the middle of the pack," as having a "somewhat confusing record of research and scholarship," and as having made only "moderate growth" in her research and scholarship.

The explanation is also supported by the poor student evaluations that Plaintiff received. More specifically, between the Fall 2005 and Summer 2010 semesters, Plaintiff consistently received much lower numerical ratings from students than the average ratings for faculty within

20

the College of Education as a whole and faculty with the Department of Psychological and Social Foundations.

**E.**   **Plaintiff's Hostile Work Environment Claims Are Meritless.**

      *1.*   *No Harassment Based On Race or Gender.*   To prevail on a claim of harassment due to race or gender, a plaintiff must present "proof that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."   Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).   In such cases, a plaintiff must present proof of the following: (1) she belongs to a protected group; (2) she has been subject to unwelcome harassment; (3) the harassment has been based on a protected characteristic; (4) the harassment is sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment; and (5) the employer is responsible for such environment under a theory of vicarious liability or a theory of direct liability.   Id.   Boorish statements or acts that do not relate to the race or gender of the plaintiff are not actionable. Gupta v. Florida Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2000); see also Laosebikan v. Coca-Cola Co., 2006 WL 224167 *5 (11th Cir. 2006) ("In a race-based case, harassing statements and conduct must be of a racial nature before they can be considered in determining whether the severe or pervasive requirement is met . . . . Accordingly, innocuous or boorish statements or other behavior that does not relate to the race of the actor or the employee does not count.").

      Plaintiff contends that Dr. Osborne discriminated against her on the basis of her race by sending her rude and condescending emails, as well as by making rude comments.   Even assuming, *arguendo*, that Plaintiff timely filed a charge of discrimination concerning those

actions -- which she did not -- her claim on this point is meritless.  Plaintiff admitted that she does not even recall the specifics of Dr. Osborne's comments, so she cannot possibly demonstrate that they were racially derogatory.  While Plaintiff does recall some specifics of the emails, she admitted that they simply consisted of comments that Dr. Osborne was "shocked" that Plaintiff was not in class when it began and that Plaintiff should not be in the back of a class reading a magazine.  In short, Plaintiff cannot demonstrate that the comments and emails were racially motivated, much less that the comments and emails were sufficiently severe or pervasive to be actionable under Title VII.

Plaintiff complaint that Dr. Osborne gave her undesirable teaching assignments because of her race is likewise meritless.  Although Plaintiff complains that Dr. Osborne assigned her to teach a course at night but assigned a Caucasian professor to teach that same class during the day, she could not identify any facts during her deposition indicating that the assignment was based upon her race.  Similarly, Plaintiff complains about the fact that Dr. Osborne assigned her to teach a course on diversity, but she could not identify any facts during her deposition to demonstrate that the assignment was based upon her race.  Moreover, Plaintiff cannot demonstrate that her assignment to teach the diversity class caused her any harm whatsoever.  To the contrary, the diversity class -- "Multi-Cultural Counseling" -- resulted in the highest student evaluations that she received in any class that she taught during the 2005-2006 academic year.  With the exception of only one (1) class, Plaintiff received higher student evaluations in the diversity class than she did in any other class that she taught during her employment with USF.

Plaintiff contends that Ms. Turner discriminated against her because of her race by making disrespectful comments or raising her voice at her and by violating protocol by soliciting evaluations from students about Plaintiff.  However, Plaintiff can offer no facts to support her

claim that Ms. Turner's actions were motivated by racial animus.  In fact, Plaintiff's claim on this point is undermined by her admission that Ms. Turner and Dr. Exum -- who is African-American -- were friends.  Plaintiff's claim that Ms. Turner singled her out and mistreated her because of her race is further undermined by her admission in deposition that Ms. Turner's negative and "toxic" attitude not only affected her, but "affected everybody."

Finally, Plaintiff complains that Dr. Zalaquett discriminated against her because of her gender by yelling at her and being condescending.  However, Plaintiff could not even explain how his actions were related to her gender.  Instead, she testified that she thought Dr. Zalaquett's actions may have been "cultural."  According to Plaintiff, everyone avoided Dr. Zalaquett.

2.     _No Retaliatory Harassment_.  Similarly, to prevail on a claim of harassment in retaliation for engaging in protected activity, a plaintiff must prove that: (1) she engaged in statutorily-protected activity; (2) she suffered a materially adverse action; and (3) there was a causal nexus between the two events.  Butler v. Alabama Dep't of Transp., 536 F.3d 1209, 1212–13 (11th Cir. 2008).

With respect to the second element -- a materially adverse action -- the Supreme Court has explained:

> The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm. . . Title VII, we have said, does not set forth "a general civility code for the American workplace." . . . An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.  See 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed.1996) (noting that "courts have held that personality conflicts at work that generate antipathy" and "'snubbing' by supervisors and co-workers" are not actionable under § 704(a)).

Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 67, 126 S.Ct. 2405, 2414-15 (2006).  Thus, it is clear that for purposes of retaliation claims arising under Title VII,

"personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers" are not considered adverse employment actions."  Smith v. Holder, 2014 WL 3867615 *4 (N.D. Fla. 2014).  Petty slights, minor annoyances, and lack of good manners are not covered.  Baker v. City of Safe Harbor, 2008 WL 4200147 *21 (M.D. Fla. 2008).  Moreover, neither are personality conflicts that generate antipathy and snubbing by supervisors and co-workers.  Id.

Plaintiff's complaint that Dr. Exum stopped inviting her to faculty meetings, and that Ms. Turner, Dr. Zalaquett, Dr. Osborn, and Dr. Exum stopped speaking to her in retaliation for engaging in protected activity fails as a matter of law.  First, as previously set forth herein, Plaintiff has not and cannot provide any facts to support her claim that such actions, even if true, were motivated by retaliatory animus rather than the result of personality conflicts.  Second, even if true, such actions constitute no more than mere snubbing, lack of good manners, and petty slights.  As such, they do not constitute unlawful retaliation under Title VII.

## IV. Conclusion

For the foregoing reasons, Plaintiff's Title VII claims are both time-barred and without merit.  USF therefore respectfully requests that this Court grant its Motion for Summary Judgment.

DATED this 23rd day of September, 2014.

Respectfully submitted,

CONSTANGY, BROOKS &
SMITH, LLP
Post Office Box 41099
Jacksonville, Florida 32203
Telephone: (904) 356-8900
Facsimile: (904) 356-8200

By:_____/s/  J. Ray Poole_____
     John F. Dickinson
     Florida Bar No. 198651
     jdickinson@constangy.com
     J. Ray Poole
     Florida Bar No. 983479
     rpoole@constangy.com
     Jesse D. Bannon
     Florida Bar No. 067896
     jbannon@constangy.com

Attorneys for Defendant, University
of South Florida Board of Trustees

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 23rd day of September, 2014, I electronically filed the

foregoing Defendant's Motion for Summary Judgment and Supporting Memorandum of Law by

using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record

herein.

_____/s/  J. Ray Poole_____

Attorney